**Rufus HARRIS, Jr., Bobby Minard, George C. Moore, Plaintiffs,**

v.

**BIRMINGHAM BOARD OF EDUCATION, Defendant.**

**Civ. A. No. 76–G–1725–S.**

United States District Court, N. D. Alabama, S. D.

April 15, 1982.

C. Michael Quinn and Robert L. Wiggins, Jr., Birmingham, Ala., for plaintiffs.

Harry L. Hopkins and Christopher H. Killion, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

GUIN, District Judge.

This cause came before the court for trial on the merits of plaintiffs' race discrimination claims. Jurisdiction of this cause exists under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The Equal Employment Opportunity Commission (EEOC) charge which forms the basis of this suit was initially filed by the American Federation of Teachers on June 29, 1973. The plaintiffs in this case, Rufus Harris, Jr., George C. Moore, and Bobby Minard, are or have been coaches with the defendant Birmingham Board of Education. Their claims basically allege that the defendant discriminated against them in relation to their positions as coaches based on race. At the close of the plaintiffs' evidence, defendant moved to dismiss the complaint under Rule 41(b) of the Federal Rules of Civil Procedure. The court recessed the trial for consideration of the motion and counsel submitted briefs to the court. Having considered the testimony and exhibits introduced at trial, as well as arguments of counsel, the court is persuaded that upon the facts and law the plaintiffs have shown no right to relief and that, therefore, the case should be dismissed.

■ The plaintiffs' positions and claims are set forth in the pretrial order which was drafted by plaintiffs' counsel and signed by the court on September 21, 1981. The pretrial order controls the course of litigation pursuant to Rule 16 of the Federal Rules of Civil Procedure.[1] According to the pretrial order, George Moore asserts three claims: (1) that he was unlawfully denied the position of head football coach at Jones Valley High School in 1973 and again in 1975; (2) that he was denied equal treatment in his application for the head football coach position at Phillips High School in 1973; and (3) that he was discriminated against in coaching assignments, teaching assignments, and wages. Plaintiff Rufus Harris asserts two claims: (1) that he was discriminated against in his transfer to Carver High School for the 1972–73 school year, and (2) that he was unlawfully discharged from coaching at Carver. Plaintiff Bobby Minard also maintains two claims: (1) that he was unlawfully assigned to Parker High School, and (2) that he was unlawfully discharged from coaching at Parker.

All three plaintiffs allege that they were discriminated against by defendant's failure

---

1. The plaintiffs asserted at trial and in brief various contentions and claims not within the scope of their position as stated in the pretrial order. These new contentions, therefore, cannot be considered as properly before the court.

to post coaching vacancies, a lack of method to apply for coaching vacancies, a lack of objective standards by which to evaluate competing candidates, and by alleged assignment of coaches in accordance with the racial composition of the student body. The plaintiffs all contend that athletic and physical education facilities at black schools are not funded as well as at white schools, and that scheduling of football and basketball games is discriminatory. The plaintiffs failed to present any evidence in support of the assertion of inequality in athletic programs and, therefore, such a claim has been abandoned by the plaintiffs. Each plaintiff seeks injunctive relief, back pay and attorney's fees. Neither Moore nor Minard seek reinstatement. Harris seeks reinstatement, presumably to an assistant coaching position at Carver High School.

It should be noted that the testimony, documentary evidence and arguments of counsel have greatly muddied the waters in this case so that it has been extremely difficult to extract the real essence of plaintiffs' claims. Apparently equally befuddled by plaintiffs' presentation, the defendant raised numerous peripheral issues in an attempt to cover all possible ground. The court, in this memorandum opinion, will attempt to deal with all relevant issues.

I. *Preliminary Issues.*

Before addressing the merits of plaintiffs' claims the court must resolve some preliminary issues. Those issues include the appropriateness of defendant's Rule 41(b) motion to dismiss; the failure of one plaintiff to file an EEOC charge; the legal standard to be applied; and the weight to be given the EEOC determination.

A. *Failure to File an EEOC Charge.*

The defendant has repeatedly challenged the existence of subject matter jurisdiction, alleging that all the plaintiffs failed to file a charge with the EEOC, and that the

matters alleged in their complaint are not within the scope of the EEOC charge filed by the American Federation of Teachers (AFT). As the evidence developed, only plaintiff Minard was not named as an aggrieved party in the AFT charge.

The AFT filed its original charge of discrimination with the EEOC on July 3, 1973, on behalf of Rufus Harris, Jr., George Moore, Jr., and two others. *See* Plaintiffs' Exhibit 25. The charge, though very poorly drafted, appears to allege, *inter alia*, that black coaches are discriminated against in promotions to head coaching positions, are transferred with promises of promotions which do not materialize, are not allowed to choose their own staff members, and that other indicia of discrimination exist as to the athletic programs, facilities and scheduling of sports events for predominately black schools.[2]

The court is of the opinion that the EEOC charge filed by AFT on behalf of Harris, Moore, and others as aggrieved parties embodies the claims asserted by Harris and Moore before this court. The court therefore concludes that, at least as to Harris and Moore, the AFT charge sufficiently complies with the requirement that a plaintiff first file a charge with the EEOC before instituting a court action. *See* Civil Rights Act of 1964, § 701 *et seq.*, 42 U.S.C. § 2000e *et seq.; Wheeler v. American Home Products Corp.*, 582 F.2d 891, 897 (5th Cir. 1977).

Although Minard was not listed as an aggrieved party in the AFT charge, he did supply the EEOC with an affidavit setting forth his claims of discriminatory conduct which were investigated by the EEOC. As made clear by the Fifth Circuit Court of Appeals in *Crawford v. United States Steel Corp.*, 660 F.2d 663, 665–66 (5th Cir. 1981), not every plaintiff in a multiple-plaintiff suit need file a charge with the EEOC as

---

**2.** Right-to-sue letters were issued to AFT and Rufus Harris, and suit was filed against the Birmingham Board of Education on December 17, 1976, by the AFT, Harris and Bobby Minard. Harris and Minard filed suit "individually and on behalf of all others similarly situat-

ed." George C. Moore, Jr., was added as a plaintiff on June 1, 1977, after receipt of his right-to-sue letter. The AFT was dismissed as a party on December 20, 1978. Class certification was denied on February 27, 1981.

long as the claims are sufficiently similar to those filed with and investigated by the EEOC. *See also, Wheeler v. American Home Products Corp.*, 582 F.2d 891, 897 (5th Cir. 1977); *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496 (5th Cir. 1968). Minard's claims involve alleged discrimination against him in coaching assignments and transfers. Clearly Minard's claims fall within the periphery of issues raised by the AFT charge and investigated by the EEOC. The court, therefore, concludes that jurisdictional prerequisites have been met as to all plaintiffs before the court.

### B. *Appropriateness of Rule 41(b) Motion.*

The plaintiffs contend that, since the defendant took advantage of the opportunity of presenting much of its case through the witnesses called by the plaintiffs before the plaintiffs rested their case, a Rule 41(b) motion to dismiss is inappropriate. The plaintiffs argue in their brief that, since there is "so little evidence left to receive," [3] the court should carry the motion to the end of the trial. The plaintiffs even assert that the defendant waived any right to dismissal at the close of the plaintiffs' case when it elected to proceed with its own defense by expanding the examination of witnesses called by the plaintiffs. No authority is cited by the plaintiffs to support their novel waiver theory, and the court finds such an argument absurd. In fact, such a contention ignores the fact that courts have recognized that, in a Title VII case, a defendant may meet its burden "out of the mouths of [the plaintiff's] own witnesses, by cross-examining them," and that a Rule 41(b) motion would then be appropriate. *Sime v. Trustees of California State University and Colleges*, 526 F.2d 1112, 1114 (9th Cir. 1975).

■ The plaintiffs confuse the order of proof in a civil trial with the allocation of the burden of proof set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct.

1817, 36 L.Ed.2d 668 (1973). There is nothing in *McDonnell Douglas* or *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), however, which prevents a defendant from proving its case before the plaintiff rests. Moreover, the plaintiff is not relieved of the burden of showing pretext before he rests when the defendant has shifted the burden back to the plaintiff through examination of witnesses called by the plaintiff. *Sime v. Trustees of California State University and Colleges*, 526 F.2d 1112, 1114–15 (9th Cir. 1975).

■■ Furthermore, the question before the court on a Rule 41(b) motion to dismiss goes further than merely whether the plaintiffs presented a *prima facie* case as a matter of law, and includes whether "upon the facts and the law the plaintiff has shown no right to relief." Fed.R.Civ.P. 41(b). The court can find no reason why it should not consider the merits of the defendant's motion at this time. It would indeed be an abuse of judicial economy to withhold a ruling in this particular case when the great bulk of all evidence which could be presented is already before the court. The court is convinced that, based on the facts ·and the law presented, the plaintiffs have failed to show that they are entitled to any relief, and, therefore, the defendant's motion for involuntary dismissal should be granted.

### C. *Legal Standard to be Applied.*

■ The plaintiffs also contend that, since the defendant is under the various desegregation orders entered by this court since 1963 in *Armstrong v. Birmingham Board of Education*, Civil Action No. 9678, the court has judicial knowledge of the defendant's past history of discrimination and that they have thus established a *prima facie* case and shifted the burden to the defendant. For support of this argument, the plaintiffs rely on *Castaneda v. Pickard*,

---

**3.** Although the plaintiffs contend that there is little evidence remaining to be presented on pages 1 through 5 of their memorandum in opposition to the motion to dismiss, they take the opposite position in support of the claims of Harris and Minard. On pages 52 and 53, plaintiffs argue that since material evidence remains to be presented as to Harris and Minard, the court should continue to take such evidence.

648 F.2d 989 (5th Cir. 1981), and *Lee v. Conecuh County Board of Education*, 634 F.2d 959 (5th Cir. 1981). While these cases do state that the burden of rebuttal is more onerous in a situation where the defendant school district has a history of unlawful discrimination, the court does not read those cases as holding that the mere existence of past discrimination acts to shift the burden to the defendant to rebut charges of individual discrimination. The plaintiffs have failed to present evidence of any discrimination against them individually by the defendant. The findings in *Armstrong* cannot be taken to create an inference that these plaintiffs have been discriminatorily treated in the particulars of their claims as limited by the pretrial order.

Before the defendant must meet the more onerous burden of rebuttal established by *Castaneda* and *Lee*, the plaintiffs must first establish a *prima facie* case in order to shift the burden of rebuttal to the defendants. This they have clearly failed to do as to Harris and Minard. While the evidence is somewhat stronger as to Moore's claims, the court concludes that, assuming Moore did present a *prima facie* case, the defendant met its onerous burden of rebuttal as will be discussed in more detail herein.

### D. Weight to be Given the EEOC Determination.

Another preliminary issue involves the weight to be given the EEOC determination introduced by the plaintiffs in support of their case. The determination is generally deemed an exception to the hearsay rule and admissible under Rule 803(8)(C), Federal Rules of Evidence, as "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." As the Fifth Circuit commented in *Smith v. Universal Services, Inc.*, 454 F.2d 154, 157 (5th Cir. 1972), a determination "is in no sense binding on the district court and is to be given no more weight than any other testimony given at trial." Further, a determination is admissible "as long as this type

of investigation is not self-serving nor compiled for purposes of litigation only," and "there is no reason to suspect any lack of trustworthiness." *Smith*, 454 F.2d at 158.

The court admitted the determination into evidence as Plaintiffs' Exhibit 24 but withheld a decision regarding the weight to be given it. The defendant challenges the trustworthiness of the determination for valid reasons. The evidence plainly reveals that the determination was issued in an irregular manner as can be seen from the EEOC file itself, particularly Plaintiffs' Exhibit 25. On February 11, 1975, the director of the Birmingham district EEOC office sent the investigative file to the chief of the decisions division of the office of compliance in Atlanta "for review and preparation of a draft decision since the case issue(s) do not fall within established Commission Decision Precedent." Plaintiffs' Exhibit 25. The next activity reflected by the file occurred on September 21, 1976, when plaintiffs' counsel requested right-to-sue letters. The Commission issued suit letters to the AFT and Harris on December 21, 1976, after several letters from plaintiffs' counsel. The original lawsuit was filed on December 21, 1976, under 42 U.S.C. §§ 1981 and 1983, and the Title VII claims were added by amendment January 7, 1977. The director of the decisions division returned the file to the Birmingham office on June 3, 1977, with instructions to issue a determination because of the "understanding that Charging Party's attorney is contemplating litigation." *See* Plaintiffs' Exhibit 25. The determination was issued on June 21, 1977.

The determination was obviously issued in "contemplation of litigation" in that suit letters had already been issued and the lawsuit had been filed for six months. Furthermore, Earnest Pugh of the Birmingham EEOC office testified that it was irregular for a determination to be prepared after the issuance of suit letters.

The trustworthiness of the determination is further eroded by the obvious disregard of the affidavits submitted by the defendant to the EEOC. The court is appalled by

the numerous erroneous and obviously slanted statements contained in the determination, the list of which is too lengthy to set out.

The court therefore concludes that the trustworthiness requirement of Rule 803(8)(C), F.R.E., has not been met and thus the court refuses to place any weight on such a self-serving document prepared in contemplation of litigation.

## II. *Individual Claims.*

### A. *George C. Moore, Jr.*

George Moore claims that racial discrimination prevented him from being awarded the head football coach position at Jones Valley High School in 1973 and also in 1975. He also asserts that he was denied equal treatment in applying for the head coach position at Phillips High School in July 1973, and that he was discriminated against in teaching and coaching assignments and wages. The court finds that race was not a factor in the defendant's decision not to select Moore as head football coach in 1973 or 1975. Further, Moore presented no evidence of any discrimination in wages, and the only evidence offered in support of the claim of discrimination in coaching and teaching assignments was Moore's own contradicted statements.

By Moore's own testimony, he was head basketball coach and assistant football coach at Shades Valley when the head football coach position came available there in July of 1973. He testified that he did not apply for the job. Simpson Pepper, principal at Shades Valley, and Bill Harris, athletic director of the Birmingham Board of Education, testified that Moore was not considered for the head football coaching job because head basketball coaches generally are not moved to head football coach. Some examples were presented by the plaintiffs where head basketball coaches did become head football coaches, but in each instance the change was made in an emergency situation. In three of the four situations, the coach later returned to coaching basketball. To move a basketball coach to a football position in the same school would leave that school with a vacancy still to be filled. The court finds it not unreasonable for a head basketball coach to be overlooked when searching for a head football coach.

Pepper and Harris further testified that they did not think Moore would be interested in the head football coach position. Moore complains that these representatives of the defendant were wrong to make such an assumption about his interests. The court finds, however, that there were ample reasons for Moore not to be considered for the football job. First, Moore testified that he never told anyone that he was interested in a position as head football coach. Second, Moore had been more heavily involved with basketball since he was hired by the defendant in 1967 to work at Ullman High School as head basketball coach. Had Moore been selected to become head football coach, he could not have continued as head basketball coach. Third, Moore admitted that he was drawing the highest coaching supplement available as head basketball/assistant football coach. To become head football coach, Moore would have had to take a reduction in pay. These factors, when taken as a whole, support the court's conclusion that the defendant was sincere in assuming that Moore would not be interested in the head football job in 1973.

Even assuming that the defendant made an erroneous assumption in not considering Moore for the Jones Valley position, that error was cured shortly thereafter. As soon as Moore learned that Coach Bruce had received the position of head football coach at Jones Valley, he contacted Bill Harris at the school board and inquired as to why he was not considered for the job. Harris expressed surprise to learn that Moore was interested in the position but immediately told him of the vacancy at Phillips High School and referred him to the principal, Billy Marsh.

Moore also complains that he was not treated equally in his application for this position at Phillips in 1973. The testimony concerning Moore's application convinces the court that Moore, by his own actions, took himself out of consideration for the

position. Moore testified that he was elated to be considered for the position and called Harris back to tell him that he would accept the job if he could have the coaching assistants that he wanted. According to Moore, Harris told him that naming his own assistants would not be possible. Moore then went to see Marsh around July 24, while Marsh was in the hospital. According to both Moore and Marsh, Marsh was satisfied with Moore and offered him the job. Moore then told Marsh that he wanted to bring Rufus Harris with him as an assistant coach.[4] The two men differ as to what words Marsh used to tell Moore that he could not bring his own assistants. Moore stated that Marsh said something to the effect that if that is what you want, too bad, while Marsh testified that he told Moore that there were no positions open at Phillips for assistant coaches. Marsh further testified that Moore then became argumentative and repeatedly insisted on bringing Harris with him. Both men agree, however, that during the entire conversation, which lasted fifteen to thirty minutes, Moore never told Marsh that he would accept the job regardless of assistant coaches. In fact, Moore phoned Marsh about a week later and still insisted that he be allowed to bring Rufus Harris with him. Moore testified that he suggested that Harris and Minard could teach at another school and coach at Phillips, and admits that Marsh told him during this conversation that there were no positions available for assistant coaches at Phillips. During this phone conversation, Marsh told Moore that, if he insisted on bringing his own assistants, he could not be head coach at Phillips. Moore never stated that he would take the job without bringing his own assistants. Marsh testified at trial that the job would have been his if Moore had not insisted on his own choices of assistant coaches.

Moore contends that he understood that the trend in the system was to give the head coach some say in suggesting assistant coaches, and that he was denied equal treatment because he was not allowed to suggest assistant coaches at Phillips. The testimony of Bill Harris, Billy Marsh and Simpson Pepper revealed that head coaches generally do help select their assistants and may make recommendations when there is a vacancy in the coaching staff. If there are competent assistants on the coaching staff, however, they cannot be moved out to allow the head coach to bring in his own assistants. Marsh testified that the assistant coaching positions were full at Phillips and that he was bound to honor the contracts with those coaches.

From all the evidence presented, the court concludes that Moore cannot now complain that he was not treated fairly in his application for the job at Phillips when it was his repeated unreasonable demands that precluded him from receiving the position. After observing the witnesses as they testified, and particularly the demeanor of George Moore, the court finds that Moore did actually insist that he be allowed to name his own assistant coaches. No evidence was introduced of any other head coach who was allowed to displace assistant coaches at a school in order to bring in his own assistant coaches; in fact, the testimony was to the contrary. Many variables must be met in placing coaches. Within the Birmingham school system, each school is allotted a certain number of teacher units for each particular subject, and coaches must be hired to fill available academic units first. That is, coaches have to fit into the allotment of teachers for the subject they are qualified to teach as well as fill a coaching position. To allow a head coach to bring in his own assistants would result in extensive shuffling of personnel not only on the coaching staff but in the academic units of the school as well. To make such an unreasonable demand a condition to accepting a job and then complain about not receiving fair consideration is taking a position which the court finds to be preposterous.

---

4. Moore testified that he requested both Rufus Harris and Bobby Minard as assistant coaches, while Marsh only recalled that Harris was mentioned.

The position Moore takes regarding the head coaching vacancy at Jones Valley in 1975 is also untenable. Again, Moore was head basketball coach when Bruce left Jones Valley in the summer of 1975. As already discussed, head basketball coaches as a general rule are not considered as candidates for a head football position. Further, Moore was not even an assistant football coach during the 1974–75 season. The evidence revealed that Coach Bruce had some problems with Moore during the 1973–74 season, and requested that Moore not coach football the next year. Those problems involved Moore being tardy to practice, not scouting with the rest of the staff and not fulfilling his duties as assistant coach. These actions by Moore conveyed to Bruce—and to the court—that Moore was not really interested in coaching football. Pepper, principal at Jones Valley, testified that Moore asked to be taken out of the football program so that he could concentrate on basketball. For whatever reason, it is evident that Moore was not involved with the football program in 1975 when the head coach position came available and in several ways had shown a disinterest in coaching football.

When Bruce resigned as head football coach, Pepper testified that Coach Galloway was the natural candidate to fill the vacancy. Galloway had proved himself as an assistant football coach and Pepper was impressed with him, and wanted him to be head coach. It would be unrealistic to find that Moore, who was not involved with the football program and who had demonstrated disinterest and had caused problems while coaching football, should have received the head football coach position, and the court refuses to so find.

The court does find that Moore's history in the Birmingham school system, both prior and subsequent to the 1973 and 1975 vacancies, reveals that he was not seriously interested in being a head football coach.

Prior to 1971, Moore served as head basketball coach at Ullman High School, an all-black school. In 1971, he was transferred to Jones Valley, at the time a predominantly white school, where he was elevated to head basketball coach in 1972. When the defendant learned that Moore was interested in a head football coaching position, he was offered the Phillips job. Instead of taking it, he attached unreasonable and unacceptable conditions to his acceptance of it. During the 1973–74 season, Moore was tardy to practice, failed to scout opponents, and allowed basketball practice to interfere with football practice. The next season Moore dropped his football assistantship to concentrate on basketball. Later, he was urged but refused to help coach football when the Jones Valley coaching staff was undermanned. He did return as assistant coach for one season, then dropped out of football completely. Moore has not coached football since the 1976 season, nor has he made any request to coach football, as either head or assistant coach. These facts, coupled with some interesting circumstances concerning the filing of the EEOC charge, convince the court that Moore's primary interest was not in becoming a head football coach.

The court finds it interesting that the AFT filed its initial charge with the EEOC on June 29, 1973—before Moore applied for the Phillips job and insisted upon naming his assistant coaches. Paragraph 8 of that charge states that "... white coaches are allowed to be hired ... and choose their own staffs while black coaches are not." This plainly could not refer to Moore because he did not talk with Bill Harris or Marsh until one month *after* this charge was filed. Instead, paragraph 8 could only refer to Rufus Harris.[5]

Moore also claims discrimination in coaching and teaching assignments, and wages. Moore's testimony revealed that he alleges

---

5. Harris was at Carver High School in 1973 as an assistant football coach when the head coach position became vacant. Mr. J. L. Lowe, a black who was the principal at Carver, discussed the vacancy with Rufus Harris, and Harris told him he would take the position if he could bring Bobby Minard with him as an assistant. Rufus Harris did not receive the position at Carver.

that he was discriminated against in the number of physical education classes to which he was assigned. Moore presented no evidence of being paid less than similarly situated whites and such a claim is deemed abandoned.

Moore asserts that some white coaches taught more physical education classes than he was allowed to teach. The testimony he offered as to the number of physical education classes he taught each year was contradicted by his master teaching schedule for those years, which he admitted to be correct. Moore is certified to teach science and physical education, and has taught both continuously since entering the Birmingham system. While Moore may have taught fewer physical education classes than did Bruce or Galloway as head football coach and head of the physical education and athletic department, someone had to teach the science courses taught by Moore, and neither Bruce nor Galloway were qualified to teach science. The plaintiffs presented no evidence of any discrimination regarding Moore's assignments. There was also no evidence offered that Moore had requested additional physical education classes. The court, therefore, finds this claim to be without merit.

■ The court concludes that plaintiff Moore has failed to show that he is entitled to any relief based upon the facts presented to the court and on the applicable law. His individual claims therefore are due to be dismissed.

B. *Rufus Harris, Jr.*

The testimony presented by Harris at trial covered many events which the plaintiffs admit are beyond the limitations period. The court refuses to spend its time addressing issues unrelated to Harris' asserted claim. Culling out those incidents, and based on the pretrial order, Harris' claim appears to be that he was discriminatorily transferred to Carver High School for the 1972–73 school year and that he was unlawfully discharged from coaching at Carver. The only testimony concerning these contentions came from Harris himself.

The undisputed evidence revealed that Harris previously taught and coached at Carver from 1969 through the spring of 1971. He was transferred to Ramsay High School in the summer of 1971 to integrate the coaching staff of that historically white school. Harris testified that he did not want to leave Carver because he could walk to school and was familiar with the neighborhood.

After he arrived at Ramsay, he had some problems as an assistant coach about which he briefly testified. The "Confidential Estimate of Teacher" in Harris' personnel file (Plaintiffs' Exhibit 31), prepared by Ramsay principal George Thomas on April 1, 1972, further reflects the problems Harris experienced at Ramsay. Thomas recommended that Harris not be reassigned to Ramsay and stated that Harris had "contributed little to our total athletic program or to the teaching of students," and that "the more militant black students seem to be drawn to him."

There exists a dispute whether Harris requested to transfer back to Carver. Harris testified that he never requested such a transfer while Bill Harris stated that the plaintiff verbally requested such. He did not sign an official request to transfer, although Harris admitted that he wrote Bill Harris requesting information about how to draft a letter requesting a transfer. A few weeks after Harris wrote the letter, he was called to a meeting at the school board office to discuss his transfer back to Carver. When asked to sign a statement that he requested a transfer, Harris refused to sign it, stating that he had been transferred to Ramsay without his written request.

■ According to a letter in Harris' personnel file (Plaintiffs' Exhibit 31), J. L. Lowe, principal at Carver, wanted Harris to be transferred back to Carver. In light of the fact that the Ramsay principal did not want Harris reassigned there, some place had to be found for him. Since the Carver principal wanted Harris, and Harris had previously expressed reluctance to leave Carver and had, in fact, sought information

on how to request a transfer, the court finds that the school board was justified in transferring Harris to Carver.[6]

Even assuming that the transfer back to Carver in 1972 was illegal, the court does not have jurisdiction over such a claim. The AFT filed its EEOC charge on June 29, 1973. Since Harris' transfer back to Carver occurred more than 180 days prior to the filing of the charge, it is barred by 42 U.S.C. § 2000e-5(e).

Harris also claims that he was unlawfully discharged from coaching at Carver. During the 1972-73 school year, Harris taught physical education and served as an assistant football coach under Coach Carleton Wells. Wells left Carver after the 1972-73 school year and Lowe sought a replacement. Lowe discussed the vacancy with Rufus Harris, and Harris said he would take the position if he could have Bobby Minard as an assistant. Harris did not receive the position; instead, Lowe selected Willie Peake, a black, to be head football coach. According to the pretrial order, Harris does not claim that he was discriminatorily denied the head football coach position at Carver. Instead, his claim is that he was illegally discharged from coaching at Carver.

Lowe introduced Peake to Harris and the other assistant coach at the first coaches' meeting in the summer of 1973. Peake asked Harris if Harris could cooperate with him two thousand per cent as assistant coach. Harris testified at trial that he agreed to cooperate although he admitted to Peake that he had a problem that he needed to resolve prior to deciding whether to serve as an assistant coach. Harris stated that he requested four days in which to clear up his "problem" which involved why he was not selected for the position. Harris testified that he received a letter from Lowe informing him that Willie Robinson, a black, would replace Harris as assistant coach. A letter in Harris' personnel file (Plaintiffs' Exhibit 31) reveals, however, that Lowe waited over a week for a decision from Harris.

■ The court finds no merit in Harris' claim that he was discriminated against because of his race when a black principal and a black head football coach hired a black assistant coach in his place. The plaintiffs assert for the first time in their brief at footnote 48, page 53, that Harris does not "claim his treatment by the black coaches and principal at Carver in 1973 was discriminatory," but instead asserts that the complained of discrimination "was the 'black marks' which Bill Harris labeled him with when he refused to be involuntarily transferred from Ramsay." The court finds such a position to be incredible. Although there was testimony about "black marks" in Harris' file, the evidence clearly reveals that those "black marks" were acquired long before the 1972 transfer from Ramsay.[7] Furthermore, such a claim falls far outside the statement of plaintiffs' positions— drafted by plaintiffs' counsel—contained in the pretrial order and, therefore, cannot be considered as a valid claim.

■ The court concludes that based on the facts presented and the law, plaintiff Rufus Harris failed to show that he is entitled to any relief. Therefore, the claims asserted by him individually must be dismissed.

**6.** Plaintiffs' attorney contends, in brief, that the evidence is not yet complete concerning Harris' transfer back to Carver and that the testimony of at least three more witnesses is "crucial" to these events. If this were true, counsel should have called those witnesses *before* resting his case. Such a contention in no way prevents the entry of a dismissal at this point in the trial.

**7.** Harris' personnel file (Plaintiffs' Exhibit 31) contains notations by the principals at Parker High School (1962-68), McArthur Elementary School (1968-69), Carver High School (1969-71), and Ramsay High School (1971-72) which refer to Harris' immaturity, impulsiveness, specific incidents that discredit him, his refusal to organize a basketball team, his bad attitude, tendency to be a "loner," disdain for responsibilities, and lack of cooperation throughout his career. The inability to get along with people has been held to be a legitimate nondiscriminatory reason for refusing to hire a person, *Frausto v. Legal Aid Society of San Diego, Inc.*, 563 F.2d 1324 (9th Cir. 1977), and the same inability would justify the refusal to promote a person.

## C. *Bobby Minard.*

According to the pretrial order, Bobby Minard claims that he was assigned to Parker High School and subsequently discharged because of his race. The evidence at trial clearly reveals that Minard was first assigned to Parker in 1964 (*see* Plaintiffs' Exhibit 33), which is well beyond 180 days prior to the filing of the EEOC charge. Therefore, a claim of discrimination in assignment to Parker is not within the jurisdiction of this court. In any event, Minard presented no evidence of unlawful racial discrimination in his assignment to Parker.

Minard taught history, coached track and was an assistant football coach at Parker. In 1968, Minard was dismissed from coaching at Parker by R. C. Johnson, the black principal.[8] Minard's discharge from coaching at Parker in 1968 was accomplished by a black and was not the result of racial discrimination. Furthermore, Minard's 1968 discharge from coaching occurred prior to the time the defendant became subject to Title VII in 1972 and well before 180 days prior to the filing of the AFT EEOC charge. The court thus does not have jurisdiction over a claim for discriminatory discharge from coaching at Parker.

In his post-trial brief, counsel for plaintiffs asserted that "Minard himself testified that the events which occurred in the Spring of 1973 at Parker [when there was a vacancy in the head football coach position] were not claimed to be discriminatory. Rather, the discriminatory events are his *reassignment from* Parker." Memorandum in Opposition to Motion to Dismiss, at 52–53. (Emphasis added.) Such a position is in direct conflict with the position asserted in the pretrial order. As mentioned numerous times before, the pretrial order controls the issues and claims in this case. Plaintiffs must be bound by the statement of position contained in that order which was drafted by plaintiffs' counsel.

Even if Minard's claim that he was discriminatorily reassigned from Parker were properly before the court, he has failed to produce any evidence to support such a claim. Apparently from his brief, Minard claims that he should have been transferred to Huffman High School as a coach in 1973. The evidence clearly shows that Minard was not available to serve as a coach during summer practice because he spent the summer working in Connecticut. As he testified, he did not return to Birmingham until late August, only a few days before he was to report to school. Minard even stated that he knew he would not be a coach in 1973 because of his late return to the city. The court, therefore, finds that it is untenable to assert that Minard was not assigned to any school as a coach because of his race when the plaintiff admitted under oath that he did not expect to coach in 1973.

Furthermore, Minard had requested a transfer from Parker in March of 1973. He testified that he made this request because he had recently received his master's degree in traffic education and wanted to teach driver's education. According to Minard, he requested to be transferred to either Glenn High School, Carver High School or Western High School. He did not request at that time to be transferred to Huffman. This is also revealed in the affidavit he gave to the EEOC. (Plaintiffs' Exhibit 27.) When he returned to Birmingham and signed in at Parker on August 27, he was informed by the principal that some teachers would be transferred. The next day, he received a call from Dr. Goodson at the Board of Education, who is black, and who gave him the choice of transferring to either Kingston Elementary or Huffman High to teach social studies, or to Lewis Elementary or Fairview Elementary to teach physical education. Minard requested time to think about his choices. When he later met with Dr. Goodson and Dr. McLain, he was told that he could take the position

8. Although Minard initially denied that he had any trouble with Johnson, he later admitted that there was a problem regarding his smoking on the sidelines at football games. His EEOC affidavit verifies that he and Johnson did, in fact, have words about smoking on the sidelines.

at Lewis or take a leave of absence.[9] Minard taught physical education at Lewis for the 1973–74 school year and then was transferred to Glenn High School in 1974 to teach driver's education, as he originally requested. The court can find no evidence of discriminatory treatment when Minard received exactly what he had requested.

Minard stated at trial that his complaint is that he has not been given an opportunity to apply for a coaching position. This contention also falls outside the scope of the pretrial order, and is not supported by the evidence. Minard repeatedly testified that he has not made any attempts to get a coaching job. He further stated that he was aware of vacancies at Glenn High in coaching while he has been teaching there but did not apply for them, or in any way express an interest in those positions. Minard has not coached in the Birmingham school system since 1973 and has not applied for a coaching position nor contacted any principal or the school board personnel about such a position. He requested an academic transfer in 1973 to be able to teach driver's education without requesting to be allowed to coach. Since 1974 he has been doing exactly what he expressed his interest in doing—teaching driver's education. Minard has failed to demonstrate to the court that he has any real desire to coach, and there is no reason to believe that the defendant should have suspected that Minard wanted to coach after his 1973 academic transfer request.

Although Minard's attorney states in his brief that Minard does not claim that his removal from coaching at Parker in the spring of 1973 was discriminatory (see Memorandum in Opposition to Motion to Dismiss, at 53–54), the court feels inclined to address that event in order to preclude another reversal of positions as to what the plaintiff claims. Minard served as assistant football coach at Parker through the 1972 football season. In the spring of 1973, the head football coaching position became vacant. Although Minard admitted that he

was aware of the vacancy, he expressed no interest in the position to the principal or the Board. Cecil Leonard, who is black, was selected by Edward Thompson, the black principal at Parker, to be head football coach. The court certainly can find no discrimination in selecting another black to be head football coach rather than Minard, if such is part of his elusive claim.

Minard testified that the new coach left him out of the coaches' meetings during the spring of 1973. He testified that Leonard came to Parker in March and that he requested a transfer in March because he realized that he was excluded from the activities of the other coaches. Minard admitted that no one told him that he would not coach at Parker and that he was never fired as a coach.

The court finds it very interesting that Minard determined in less than a month's time that he would not be coaching at Parker and requested an academic transfer in order to teach a subject in which he had just received a master's degree. The court, having observed Mr. Minard testify, is not favorably impressed with his credibility and finds it highly unlikely that he was forced out of coaching by being excluded from coaches' meetings for less than a month.

Assuming that Minard claims that he was dismissed as a coach at Parker for the 1973–74 season, such an assertion would also be untenable. He applied for an academic transfer in March of 1973 and therefore was not available to coach at Parker for the 1973 season.

The court has diligently tried to determine exactly what Minard claims to have been discriminatory actions against him. From the testimony and exhibits presented at trial and the arguments submitted by counsel, the court can glean nothing that even comes near to establishing a *prima facie* claim of discrimination. Therefore, the court must conclude that upon the facts and the law the plaintiff has shown no right to relief and the defendant is entitled to have the case dismissed.

---

**9.** Minard testified at trial that his option was either the Lewis job or resignation. His EEOC affidavit, however, stated that he was offered the Lewis position or a leave of absence.

III. *Group Claims.*

All three plaintiffs contend that they were discriminated against by (1) the defendant's failure to post coaching vacancies; (2) a lack of a method to apply for coaching vacancies; (3) a lack of objective standards by which to evaluate competing candidates; (4) use of principals' recommendations without objective criteria; and (5) by alleged assignment of coaches in accordance with the racial composition of the student body.[10] The first four of these claimed unlawful practices reflect so-called impact claims; that is, these practices are alleged to have an adverse impact on blacks. The fifth assertion claims intentional assignment of coaches based upon the race of the coach and the racial composition of the student body.

The court finds that these five claims asserted by all three plaintiffs fall within the *Armstrong* case over which this court has had jurisdiction since 1960. That case, often referred to as the Birmingham school case, encompasses a class which includes the plaintiffs in this case. In fact, the court's order of November 19, 1968, specifically requires integration of athletic programs. The court, in 1970, ordered the dual school system to be dismantled, which involved a merger of students and faculty, including coaches. The defendant was then required to make assignments in the schools in order to reach a substantially equal ratio of negro to white teachers in each school. In 1976, the court reexamined the student and faculty arrangements, including coaches, and entered an order, and in 1979 approved a faculty adjustment once again.

The plaintiffs consistently overlook the fact that coaches are first and foremost teachers. They are hired in a recognized area of certification, to teach a particular subject. While a teacher may also be a coach or perform duties in one or more of the many secondary roles, that person is primarily a teacher.

The defendant is not required to achieve a substantially equal ratio in each subject taught within the school system, much less in the secondary roles. Under the standards enunciated in *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1970), the defendant is required to integrate its faculty. The defendant has done that by focusing on the subject matter taught and the race of those teaching the subject matter. Coaches, as well as others with secondary roles, have been counted and divided as teachers—not as coaches. The court does not view *Singleton* as requiring the defendant to obtain a particular ratio of black to white coaches, and refuses to make such a requirement.

The court further finds that the impact claims raised by the plaintiffs are more properly before the court in the *Armstrong* case which views the entire Birmingham school system as a whole and does not look at an isolated fragment such as coaches. The integration of the faculty as a whole has been accomplished through *Armstrong* and the court will not now order a systematic integration of coaching staffs to achieve any particular ratio in that segment of overall faculty. Furthermore, the *Armstrong* case appears to be near dismissal because the whole system is unified, and the court, especially at such a time, after so many years of litigation of faculty ratios among other issues, should not be called upon now to supervise minutely balanced racial integration of one small segment of the system-wide faculty.

The plaintiffs' claim for injunctive relief is also within the *Armstrong* case. Not only have the plaintiffs failed to show any right to relief, if they were entitled to injunctive relief at all it would be more properly sought through the *Armstrong* case.

---

**10.** The plaintiffs also allege that athletic and physical education facilities at black schools are inferior to those at white schools, that black schools do not receive as much financial support as white schools, and that scheduling of football and basketball games is discrimina-tory. As already mentioned, the claims of inequality in athletic programs and discrimination in scheduling of sports events have been abandoned since the plaintiffs failed to introduce any evidence in support of those contentions.

The court is of the further opinion that the plaintiffs failed to show any injury to them as a result of these practices which they allege to have a discriminatory impact. As mentioned in the discussion of each individual claim, the plaintiffs were not denied any coaching positions as a result of their race. While it may be a good idea for the defendant to post vacancies in coaching positions and to provide a method by which to apply for such vacancies, the plaintiffs failed to show any injury to them as a result of the lack of such procedures.

In support of their impact claims, the plaintiffs introduced various charts prepared by plaintiffs' counsel (Plaintiffs' Exhibits 38–44). The court finds those charts to be very untrustworthy. The numbers of coaches and positions on those charts do not mesh with the numbers contained in Plaintiffs' Exhibit 47, from which the information on the charts is purportedly taken. In view of the unreliability of the plaintiffs' proffered statistical data, those charts fail to show any discriminatory impact from the personnel practices about which plaintiffs complain.

Plaintiffs assert that the lack of objective standards for selection of coaches discriminates against blacks. The court, being an avid sports fan, is well aware that the qualifications for a good coach are, of necessity, very subjective. Moreover, the qualifications listed by plaintiff Moore in his testimony were highly subjective—good citizenship, character, experience and ability to get along with parents and students. Again, the plaintiffs failed to demonstrate how such necessarily subjective requirements discriminate against them, and therefore no relief can be granted.

IV. *Conclusion.*

After reviewing the evidence presented and the often unsound and vacillating arguments of counsel, the court is convinced that each plaintiff has failed to show the existence of any racially discriminatory treatment. The court concludes that, based upon the facts and law, the plaintiffs have not shown that they are entitled to any relief. The case, therefore, should be dismissed pursuant to Rule 41(b) of the Federal Rules of Civil Procedure.